LEXSEE 2007 DEL. CH. LEXIS 65

**METCAP SECURITIES LLC, AND NORTH AMERICAN SENIOR CARE, INC., Plaintiffs, v. PEARL SENIOR CARE, INC.; PSC SUB INC.; GEARY PROPERTY HOLDINGS, LLC; AND BEVERLY ENTERPRISES, INC., Defendants.**

C.A. No. 2129-VCN

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*2007 Del. Ch. LEXIS 65*

January 25, 2007, Submitted
May 16, 2007, Decided
May 16, 2007, Filed

**NOTICE:**

THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**SUBSEQUENT HISTORY:** Reargument denied by *MetCap Secs. LLC v. Pearl Senior Care, Inc.*, 2007 Del. Ch. LEXIS 92 (Del. Ch., June 29, 2007)

**COUNSEL:** [*1] Joel E. Friedlander, Esquire and James G. McMillan, III, Esquire of Bouchard Margules & Friedlander, P.A., Wilmington, Delaware; and Martin Stein, Esquire of Heller, Horowitz & Feit, P.C., New York, New York, Attorneys for Plaintiffs.

Bruce E. Jameson, Esquire and Laina M. Herbert, Esquire of Prickett, Jones & Elliott, P.A., Wilmington, Delaware; Joseph F. Donley, Esquire of Dechert LLP, New York, New York; and H. Joseph Escher, III, Esquire of Dechert LLP, San Francisco, California, Attorneys for Defendants.

**OPINION**

**MEMORANDUM OPINION**

NOBLE, Vice Chancellor

**I. INTRODUCTION**

An entity with no assets of its own was formed for the special purpose of a future transaction with a for-profit nursing home chain. It engaged the services of an investment banking advisory firm, agreeing to pay it a success fee upon the completion of any transaction with the target company. The assetless entity, along with two other acquiring entities, eventually entered into a merger agreement with the target company. The merger agreement contained a standard no-brokers' fee provision, stating that no broker, finder, financial advisor, or investment banker could expect to receive a fee for work performed in connection with [*2] the merger. The provision contained a parenthetical exception for the investment banking advisor engaged by the assetless entity.

Three months after the merger agreement was signed, the parties agreed that the three acquiring entities would be exchanged for three other acquiring entities, who would assume the obligation to acquire the target company from the original group of acquirers. Reference to the financial advisor's success fee remained intact. That would soon change as efforts to finalize their agreement came to a close.

Late into the final evening of negotiation of the last set of amendments to the merger agreement, the two principals representing the original acquiring entities, who had previously delivered their signature pages to a fellow law partner, left the negotiations and went home. They gave him no instructions, limitations, or conditions on which to proceed during the negotiations. A few hours later, another partner, still negotiating the terms of the amendment, would agree to delete the merger agreement's one reference to the financial advisor's fee. The practical effect of this amendment was that the

obligation to pay the success fee was neither assigned to nor assumed [*3] by the second group of acquirers.

Both the investment banking advisory firm and the assetless entity which had engaged its services bring suit for reformation. The firm also brings suit for fraud, unjust enrichment, and for damages under a third-party beneficiary contract theory. Before the Court is a motion to dismiss on behalf of the second group of acquirers and the target corporation.

## II. BACKGROUND

1

> 1  The Background is drawn from the Amended Complaint (sometimes, the "Complaint") and those documents referenced by the Amended Complaint.

Plaintiff North American Senior Care, Inc. ("NASC") is a Delaware corporation and special purpose entity formed in connection with a transaction with Defendant Beverly Enterprises, Inc. ("Beverly"), a Delaware corporation that operates nursing home facilities throughout the United States. 2 On August 16, 2005, NASC, along with NASC Acquisition Corp. ("NASC Acquisition") and SBEV Property Holdings LLC ("SBEV"), entered into a merger agreement (the "Merger Agreement") with Beverly whereby it would be acquired in an all-cash deal of more than $ 2 billion. 3

> 2  Compl. PP 7, 11.
> 3  Id. P 8; Herbert Aff. Ex. C ("Merger Agreement").

Sometime prior to the Merger [*4] Agreement, NASC had engaged Plaintiff MetCap Securities LLC ("MetCap") to serve as its financial and business advisor in connection with a Beverly transaction. The five-page agreement (the "Advisor Contract"), which was only between NASC and MetCap, provided for an "investment advisory fee" to be paid to MetCap, along with expenses, upon the closing of any business combination transaction with Beverly. 4

> 4  Id. P 9; Herbert Aff. Ex. B ("Advisor Contract"). Payment of the fee was guaranteed by SBEV. See Advisor Contract at 5. The Advisor Contract remained in force when the Beverly deal closed.

Although a court assessing a motion to dismiss typically only considers facts alleged in the complaint, it may also consider documents referred to in the complaint. See In re Gen. Motors (Hughes) S'holder Litig., 897 A.2d 162, 169 (Del. 2006). Here, several documents are expressly or impliedly referenced in the Complaint: the Merger Agreement, the Advisor Contract, preliminary and final drafts of the Third Amendment to the Merger Agreement, and certain e-mails.

The Merger Agreement, by Section 5.10, recited generally that no financial advisor's fees were owed, but it expressly referenced the MetCap [*5] fee: 5

> No broker, finder, financial advisor, investment banker or other Person (other than Wachovia Securities and MetCap Securities LLC, the fees and expenses of which will be paid by Parent) is entitled to any brokerage, finder's, financial advisor's or other similar fee or commission in connection with the Merger based upon arrangements made by or on behalf of Parent or Merger Sub. 6

> 5  Compl. P 10.
> 6  The Merger Agreement referred to NASC as "Parent" and to NASC Acquisition as "Merger Sub."

NASC, however, was without assets of its own. 7 Thus, for several months before August 2005, Leonard Grunstein, a principal of SBEV and a partner at the law firm of Troutman Sanders LLP ("Troutman Sanders"), sought financing to fund the obligations that would be incurred as part of a transaction with Beverly. 8 He negotiated extensively with Ronald Silva of Fillmore Capital Partners ("Fillmore Capital") and its counsel, Joseph Heil of the law firm of Dechert LLP ("Dechert"). 9 In the course of these negotiations, Silva and Heil were given drafts of the Merger Agreement; each draft included Section 5.10 and its reference that the MetCap fee was to be paid by NASC. 10

> 7  Id. P 11.
> 8  Id. P 13.
> 9  Id.

10  *Id.* P 14.

The [*6] Merger Agreement was amended on September 22, 2005, to reflect the equity that was to be secured to fund the acquisition of Beverly. Section 2.11 of this amendment (the "Second Amendment") [11] provided that Fillmore Capital would deliver an "Equity Commitment Letter" by November 18, 2005, detailing Fillmore Capital's commitment to purchase the "common stock and preferred stock of Parent [NASC] for at least $ 350 million to cause Parent . . . to make the proceeds of such purchase available as consideration for the [Beverly] merger." [12] The Second Amendment did not alter, or even reference, NASC's obligation (as "Parent") to pay the MetCap fee as described in Section 5.10 of the Merger Agreement. [13]

> 11  The First Amendment to the Merger Agreement is not pertinent to the dispute before the Court.
> 12  *Id.* P 15. The Equity Commitment Letter was signed by Silva and attached as Exhibit C to the Second Amendment.
> 13  *Id.* PP 15-16.

In mid-November, Silva announced that he had raised the $ 350 million in equity that was the subject of the Second Amendment. Shortly thereafter, on November 20, 2005, the parties to the merger executed another amendment (the "Third Amendment"), which would shift the obligation [*7] to purchase Beverly from the NASC, NASC Acquisition, and SBEV, entities all represented, at least to some extent, by Troutman Sanders, to Pearl Senior Care, Inc. ("Pearl"), PSC Sub Inc. ("PSC"), and Geary Property Holdings, LLC ("Geary"), [14] all created at Silva's behest and represented by Dechert. [15] Before the negotiations had culminated in the final version of the Third Amendment, however, Grunstein (for SBEV) and Mark Goldsmith, also a Troutman Sanders partner, (for NASC and NASC Acquisition) signed signature pages on November 18, 2005, and had them delivered to Lawrence Levinson, another attorney at Troutman Sanders, to be held in escrow. [16] The signature pages were eventually attached to the final version of the Third Amendment.

> 14  *Id.* PP 17-18. Silva is the president of Pearl and PSC, entities formed by Fillmore Capital. It should also be noted that the names of the substituted acquiring entities are taken from the Complaint. The Defendants maintain that Pearl and PSC have been incorrectly named in the Complaint and that their proper names are Pearl Senior Care, LLC and PSC Sub LLC.
> 15  The Complaint (P 17) states that shortly before execution of the Third Amendment, Grunstein suggested [*8] that the names of the original acquiring entities be changed from NASC, NASC Acquisition, and SBEV to Pearl, PSC, and Geary, respectively. The reasons for the requested change are not alleged and the effects of that change are not clear, but the Court notes that the parties appear to agree that the name changes are not pertinent to their dispute, which focuses primarily on the execution of the Third Amendment.

As a result of the Third Amendment, Fillmore Capital would not purchase the stock of NASC. As a consequence, perhaps not fully appreciated at the time, of this structural change, the pending dispute would evolve.

> 16  *Id.* P 19.

But negotiations were far from over. On November 20, 2005, various drafts of the Third Amendment were circulated throughout the day between, *inter alia,* Grunstein and Goldsmith (on behalf of the assignor acquiring entities) and Silva and Heil (on behalf of the assignee acquiring entities). [17] None of these drafts altered, much less referenced, Section 5.10 of the Merger Agreement. By 7:00 p.m. that evening, Beverly's Board of Directors had approved the latest draft of the Third Amendment--again, a draft that did not reference Section 5.10 or the MetCap fee. [*9] Around 10:00 p.m., Grunstein and Goldsmith, apparently believing that no further changes would be forthcoming, went home.

> 17  *Id.* P 20.

But one of Grunstein and Goldsmith's other partners at Troutman Sanders, W. Brinkley Dickerson, stayed behind. At Heil's request, Dickerson, apparently without consulting with his partners, made the change to the Third Amendment that is at the center of the parties' dispute. [18] At 12:59 a.m. on November 21, 2005, a few hours after Grunstein and Goldsmith had left, Dickerson e-mailed Beverly's counsel at Covington & Burling LLP and copied several parties, including Grunstein (for SBEV) and Heil (for Silva and Pearl), but not Goldsmith (for NASC and NASC Acquisition). [19] Another draft had emerged. This time, a provision of the Merger Agreement--and perhaps a critical one for MetCap--was

stricken. Section 3.9 of the Third Amendment deleted the parenthetical of Section 5.10, which concerned payment of the MetCap fee. [20] The obvious significance was that Pearl, as a party generally assuming NASC's duties under the Merger Agreement (an assignment made by the Third Amendment), would not have any even arguable contractual obligation to pay MetCap for its advisory [*10] services. The final version of the Third Amendment, which appeared around 4:00 a.m. on November 21, 2005, reflected this change, a change that MetCap and NASC would not discover until March 2006.

> [18] *Id.* P 23.
> [19] Goldsmith e-mailed Dickerson earlier that evening at 9:36 p.m., informing him that, although he was unsure if the Third Amendment had to be signed that evening, he had given Levinson, another colleague at Troutman Sanders, his signed signature pages on behalf of NASC and NASC Acquisition. *See* Herbert Aff. Ex. H.
> [20] Section 3.9 of the Third Amendment provided: "Section 5.10 of the Merger Agreement is amended by deleting the parenthetical contained therein."

In their Complaint, MetCap and NASC explain that "[w]hat happened was that defendants caused the new version of Section 3.9 to be drafted; and signature pages were removed from a prior version of the Third Amendment and attached to the new unauthorized version." [21] This occurred, of course, after Grunstein and Goldsmith had departed. They allege that Dickerson was only "deal counsel" to all the buyers in the transaction, collectively "coordinating and representing everyone on the buyer's side," [22] but that he lacked the authority [*11] to bind NASC, NASC Acquisition, or SBEV individually. [23]

> [21] Compl. P 22.
> [22] *See* Tr. of Oral Arg. Jan. 27, 2007, at 44.
> [23] Compl. P 23. It is not alleged that Troutman Sanders represented MetCap.

The Defendants' conduct with respect to the Third Amendment forms the basis for MetCap and NASC's claims. The Complaint makes no allegations of a separate agreement, such as an amendment to, or an assignment of, the Advisor Contract by which Pearl, PSC, or Geary, agreed expressly to assume NASC's obligation to pay MetCap.

The merger with Beverly closed on March 14, 2006. [24] Despite the work it performed in connection with the transaction, MetCap has yet to receive any portion of its advisory fee and now seeks recovery against Pearl, PSC, Geary, and Beverly. [25]

> [24] *Id.* P 26.
> [25] Fillmore Capital reimbursed MetCap $ 1.5 million for sums it had advanced in connection with the transaction. *Id.* P 25. The Complaint does not address the status of MetCap's efforts, if any, to collect from SBEV under its guarantee of the Advisor Contract.

### III. CONTENTIONS

Seeking to recover an investment advisory fee it claims it is owed, MetCap, along with NASC, filed a four-count Amended Complaint. In Count One, MetCap alleges [*12] that the Defendants, with the exception of Beverly, defrauded it of its fee by failing to disclose that Section 3.9 of the Third Amendment had been changed to remove the reference in the Merger Agreement regarding payment of MetCap for its services. Because of the silence of the Defendants with respect to this late-hour change, MetCap, to its detriment, continued working. In Count Two, MetCap alleges that all of the Defendants were unjustly enriched by the work it performed in connection with the merger because they knew that, after adoption of the Third Amendment, NASC was no longer a party to the Merger Agreement and, in addition, had no assets of its own. Without relief, MetCap argues that the Defendants will have received the benefit of its work through NASC's assignment of developed contract rights without assuming a material obligation that should have come with it: compensating MetCap for its services. In Count Three, MetCap alleges that Pearl became and remains obligated to pay the fee because MetCap, as an intended third-party beneficiary of the Merger Agreement before the Third Amendment, never consented to the change caused by Section 3.9 of the Third Amendment. [26] Finally, [*13] both MetCap and NASC seek reformation of the Third Amendment because of its alleged failure to express the agreement between the parties that Pearl would assume NASC's obligation to pay MetCap's fee.

> [26] Section 3.9 of the Third Amendment, throughout this Memorandum Opinion, will be used to refer to the final version which deleted the parenthetical contained in Section 5.10 of the

Merger Agreement. Before the final revisions, Section 3.9 addressed subject matter not related to the pending dispute.

Pearl, PSC, Geary, and Beverly have collectively responded by moving to dismiss this action under Court of Chancery Rule 12(b)(6). [27] They focus on two points: first, NASC's counsel consented to the addition of Section 3.9 of the Third Amendment; and, second, any right MetCap has to a fee is governed solely by the Advisor Contract it has with NASC, as there is neither an agreement between MetCap and any of the Defendants nor an agreement in which any of the Defendants assumed NASC's obligation under the Advisor Contract.

[27] They also challenge, under Court of Chancery Rule 9(b), the adequacy of the Plaintiffs' efforts to plead fraud and mistake with particularity.

## IV. ANALYSIS

### A. The [*14] Applicable Standard

A motion to dismiss under Court of Chancery Rule 12(b)(6) may be granted only if "it appears with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the plaintiffs would not be entitled to relief." [28] This is because, in considering such a motion, the Court is required to accept the well-pleaded facts alleged in the complaint as true and to view those facts, and all reasonable inferences that may be drawn from them, in the light most favorable to the plaintiffs. [29] The Court is not, however, compelled to accept every strained interpretation of fact or every conclusory allegation unsupported by facts contained in the complaint. [30]

[28] *VLIW Tech., L.L.C. v. Hewlett-Packard Co.*, 840 A.2d 606, 610-11 (Del. 2003) ("Accordingly, under Delaware's judicial system of notice pleading, a plaintiff . . . need only allege facts that, if true, state a claim upon which relief can be granted."); *see Palese v. Del. State Lottery Office*, 2006 Del. Ch. LEXIS 126, 2006 WL 1875915, at *2 (Del Ch. June 29, 2006), aff'd, 913 A.2d 570 (Del. 2006) (TABLE); *see also Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (reminding [*15] that a court's role on such a motion is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof).

[29] *E.g., Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, L.P.*, 829 A.2d 143, 148-49 (Del. Ch. 2003). The Court may also consider documents integral to the complaint and incorporated by reference. *Id. at 149.*

[30] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d at 168.

### B. The Complaint Fails to State a Claim for Fraud Against Pearl, PSC, or Geary

MetCap's first claim is for fraud. The Complaint alleges that Pearl, PSC, and Geary, defrauded MetCap when they: (1) inserted Section 3.9 of the Third Amendment at the last minute without the knowledge or authorization of either MetCap or NASC and (2) failed later to disclose this change. [31] The purpose and effect of the Defendants' conduct was, MetCap contends, to deprive it of its fee and to induce it to continue working on the merger. [32]

[31] Although Count One (the one alleging fraud) is brought only by MetCap against Pearl, PSC, and Geary, the parties appear to have joined issue as if both MetCap and NASC had asserted that claim. *See* Defs.' Opening Br. at 19 [*16] ("Plaintiffs have failed to allege . . . that Defendants made any false statements."); Pls.' Ans. Br. at 33 ("Plaintiffs have a claim for fraud . . ."); Defs.' Reply Br. at 13 ("[P]laintiffs' fraud claim is defeated by the imputation of Troutman Sanders' knowledge to Leonard Grunstein."). The Court, however, will address only the claims asserted in the Complaint. A fraud claim by NASC is not among them.

[32] Compl. PP 29-30.

To state a common law fraud claim, MetCap must plead facts supporting an inference that: (1) Pearl, PSC, or Geary falsely represented or omitted facts that they had a duty to disclose; (2) they knew or believed that certain representations were false or made representations with a reckless indifference to the truth; (3) they intended to induce MetCap to act or refrain from acting; (4) MetCap acted in justifiable reliance on the representation; and (5) MetCap was injured by its reliance. [33]

[33] *See DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 958 (Del. 2005); *see also Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del.