61   The Court does not need to resolve whether payment of MetCap was material to the Merger Agreement. *See Insituform*, 534 A.2d at 270. *See also Madison Realty*, 2001 Del. Ch. LEXIS 37, 2001 WL 406268, at *1, *5 (finding the engagement of third-party providers of. "personnel, services, and infrastructure that [were] essential both to operate, and to acquire" a partnership's investment interests was not a material purpose of a partnership organized for "the limited purpose to purchase . . . hold and otherwise manage . . . equity or any debt securities [of the partnership]" and, thus, the third-parties were merely incidental beneficiaries with no more standing to sue [*35] for breach of the partnership agreement "than would the local utility company or the office supply store").

Moreover, even if MetCap had been a third party beneficiary of the Merger Agreement before the Third Amendment, its claim would, nonetheless, be dismissed. MetCap correctly notes that a contract benefiting a third party who has acted in reliance upon its cannot be amended to the detriment of the third party beneficiary without its consent. 62 MetCap, however, is confronted with the inescapable fact that the Third Amendment changed nothing regarding its rights. Before the Third Amendment, NASC was obligated to pay MetCap's fee. After the Third Amendment, NASC was obligated to pay MetCap's fee. Its right to seek to recover its fees from NASC has not changed. MetCap, instead, seeks to elevate its rights at the expense of entities which were not parties to the Merger Agreement at any time when it--even arguably--was expressly provided a benefit under the Merger Agreement. 63

62   *See* RESTATEMENT (SECONDS) OF CONTRACTS § 311(3) (1981).
63   Before the Third Amendment, the term "Parent" was defined as NASC. Thus, any reference to "Parent" prior to the Third Amendment meant NASC and only NASC. [*36] The Merger Agreement, by its terms, at no time in its history, ever expressly obligated any party other than NASC (assuming for these purposes that it did obligate NASC) to pay MetCap's fee.

In sum, MetCap has failed to allege a claim as a third-party beneficiary under the Merger Agreement.

E.   *The Carefully Crafted Allegations of the Complaint Preclude Dismissal of NASC's Claim for Reformation; MetCap is Not so Fortunate*

Finally, both MetCap and NASC seek reformation of the Third Amendment to the Merger Agreement to reflect the parties' understanding, or so it is alleged, that Pearl was to assume all of NASC's obligations, including the obligation to pay MetCap. Specifically, they petition the Court to eliminate Section 3.9 of the Third Amendment, which deleted the parenthetical in Section 5.10 of the Merger Agreement. Under Delaware law, the Court may use its equitable power to "reform" a contract so that it expresses the "real agreement" 64 of the parties in three circumstances: mutual mistake, unilateral mistake, and fraud. 65 Count Four of the Complaint seeks reformation on the basis of unilateral mistake and fraud (or "knowing silence"). 66

64   *Colvocoresses v. W.S. Wasserman Co.*, 26 Del. Ch. 333, 28 A.2d 588, 589 (Del. Ch. 1942) [*37] ("The very purpose of reformation by a Court of Equity is to make an erroneous instrument express correctly the real agreement between the parties; *no court can make a new contract for them.*") (emphasis added).
65   *See e.g., Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1151 (Del. 2002); *James River-Pennington, Inc. v. CRSS Capital, Inc.*, 1995 Del. Ch. LEXIS 22, 1995 WL 106554, at *2 (Del. Ch. Mar. 6, 1995) ("Reformation is appropriate only when the contract does not represent the parties' intent because of fraud, mutual mistake or, in exceptional cases, a unilateral mistake coupled with the other parties' knowing silence.").
66   Compl. P 43.

MetCap and NASC first plead that reformation is necessary because the final draft of the Third Amendment did not comport with the prior understanding among the parties. The prior agreement to which the Plaintiffs cite is evidenced by the version of the Third Amendment that was circulated by e-mail at 9:04 p.m. on November 20, 200.5. 67 In that version, Sections 1.1 and 1.2 made plain that NASC, NASC Acquisition, and SBEV were assigning all rights and obligations under the Merger Agreement and that Pearl, PSC, and Geary were assuming all of those rights and obligations. [*38] Significantly, no reference was made to Section 5.10 of the Merger Agreement or to the MetCap fee itself (*i.e.*,

the parenthetical contained in Section 5.10. of the Merger Agreement remained intact).

> 67  *Id.* P 10. Dickerson sent the 9:04 p.m. e-mail. Recipients included Grunstein, Goldsmith, Heil, Silva, and Levinson. *See* Herbert Aff. Ex. I.

MetCap and NASC assert that the agreement contained in the e-mail of 9:04 p.m. represents a specific prior agreement that differed materially from the version of the Third Amendment that appeared at 12:59 a.m. on November 21, 2005. Goldsmith and Grunstein had been involved in the negotiations all day on November 20, and no one had ever broached the subject of payment of MetCap's fee. They relied, so NASC alleges, on the course of conduct of negotiations among the parties that assured them that they would be consulted if any such changes were contemplated.

In *Cerberus International, Ltd. v. Apollo Management, L.P.*, the Supreme Court held that, regardless of whether mutual mistake or unilateral mistake is cited as the ground for reformation, "the plaintiff must show by clear and convincing evidence that the parties came to a specific prior understanding [*39] that differed materially from the written agreement," 68 Moreover, "[t]his understanding need only be complete as to the issue involved . . . [i]t need not constitute a complete contract in and of itself." 69 Thus, the Court must determine here whether NASC has alleged facts demonstrating that the parties came to a "real agreement," not on all aspects of the merger itself, but on the more narrow issue of which entity was to pay MetCap.

> 68  794 A.2d 1141, 1151-52 (Del. 2002).
> 69  *Id.* at W52.

The *Cerberus* case is instructive in two factual respects. First, the Court concluded that a rational fact finder could have concluded that the parties had reached a specific prior understanding with respect to the disposition of certain proceeds because one party had stipulated that the specific disposition was a condition to going forward and the other party had consented. Second, the Court determined that there was no evidence in the record that the parties altered this agreement in subsequent negotiations. 70

> 70  As explained in *Cerberus*:
>
> First, we turn to the element of the prior agreement. Cilurzo told Harris in writing that having the proceeds from the options and warrants go to MTI's stockholders was [*40] a condition to further negotiations, and Harris responded in his handwritten note on that writing: "This looks fine." *Absent any evidence that this term was eliminated in the negotiation process* (and there is none on this record), it is certainly a permissible inference that the parties had a prior agreement relative to the proceed^ from the options and warrants.
>
> *Id.* at 1153 (internal citations omitted) (emphasis added).

By contrast, the revision to the Third Amendment did occur within the context of a negotiation process. After Grunstein and Goldsmith departed, Dickerson continued to represent NASC and other "acquiring entities" that night as "deal counsel." 71 With respect to the negotiation of the Third Amendment, Pearl, PSC, and Geary, were represented by Heil. Because the change to the Third Amendment occurred during the negotiations between these two groups, there was an obvious divergence from the key facts in *Cerberus*. When Goldsmith and Grunstein left, the negotiations had not concluded, and it is difficult to accept that, in these circumstances, a "real agreement" between parties had been reached when those parties were still in the fluid process of negotiating, drafting, and [*41] arriving at a common understanding.

> 71  The definitional contours of "deal counsel," a term without well-defined, independent significance, present a recurring conundrum. Indeed, it is not clear from the Complaint whether NASC seeks to describe a role for Dickerson that differs from Troutman Sanders generally. Whether an attorney representing others as "deal counsel" has exceeded the scope of his or her authority would, of course, depend upon the conduct and understanding of the parties whom he or she was representing. It would also be a question for this Court, one that could only be considered in light of, among other things, the

nature of the parties' relationship and the existence of any limitation on that relationship.

It is not surprising that, in the context of negotiating complex transactional documents, parties (and their attorneys) routinely accept that those attorneys representing counterparties to a contract are acting with the requisite authority to bind their principals. Although a motion to dismiss provides the Court with a poor forum for considering the issue of apparent authority, especially because all reasonable inferences must be drawn in favor of the nonmoving party, [*42] the Court would eventually be guided by the general maxim within our law that "[i]f a third party relies on the agent's apparent authority in good faith and is justified in doing so by the surrounding circumstances, the principal is bound to the same extent as if actual authority had existed." *Old Guard Ins. Co. v. Jimmy's Grille, Inc.*, 2004 Del. LEXIS 417, 2004 WL 2154286, at *3 (Del. Sept. 21, 2004) (citations omitted). For the moment, however, it is notable that MetCap and NASC have offered no allegation in their Complaint that Heil, as counsel to Pearl and its related entities during the negotiations, was aware of any limitation on Dickerson's authority whether as "deal counsel" or as a partner in Troutman Sanders for purposes of the Beverly transaction.

That NASC may now regret the outcome of Dickerson's efforts that evening is, of course, not cause to rewrite a contract negotiated by sophisticated counsel. The Complaint, however, alleges specifically that Dickerson had no authority to make the changes on behalf of NASC or SBEV because, again according to the Complaint, he was not separately representing NASC or SBEV.

The Complaint, accordingly, may be read to allege that it had been agreed, perhaps [*43] through acquiescence, that the parenthetical of Section 5.10 of the Merger Agreement would not be changed (or was not to be the subject of further negotiation in the absence of Goldsmith and Grunstein) even though negotiation of other issues was continuing. That sufficiently alleges the prior understanding that is essential to a reformation claim. Thus, the Complaint alleges that the Third Amendment, as the result of a unilateral mistake attributable to Dickerson, did not reflect the parties' intent. [72]

72   By Court of Chancery Rule 9(b), both mistake and fraud must be pled with particularity. The Complaint, with its detailed, although selective, recitation of certain events of the evening of November 20, satisfies that standard.

Unilateral mistake alone does not provide a basis for reformation. It must be coupled with "knowing silence." [73] Dickerson did not send Goldsmith, NASC's principal in the negotiations, the final version of the Third Amendment. [74] Therefore, Goldsmith (and, presumably, NASC) was unaware of the Third Amendment. Similarly, Pearl, its counsel, and related entities, did not supply the information to NASC either. [75] Thereafter, Pearl and its counsel remained silent [*44] about the changes.

73   See, e.g., *Universal Compression, Inc. v. Tidewater, Inc.*, 2000 Del. Ch. LEXIS 151, 2000 WL 1597895, at *7 (Del. Ch. Oct. 19, 2000) (referring to "knowledge and concealment").
74   An e-mail that Goldsmith had sent to Dickerson before "signing off" of his computer that evening indicates that he had signed multiple copies of the signature pages for NASC and NASC Acquisition and that he had instructed Dickerson that the signature pages had been left with Levinson. See Herbert Aff. Ex. H. The Court notes that Dickerson e-mailed the offending change to Grunstein (but, for reasons that cannot be gleaned from the Complaint, not to Goldsmith) within hours.
75   Heil and others affiliated with Pearl received a copy of Dickerson's e-mail transmitting the Third Amendment; that e-mail does not reflect that a copy was sent to Goldsmith.

Under agency law, the knowledge of an agent is generally imputed to his principal except when the agent's own interests become adverse. [76] In the context of "dual agency," or where an agent acts in a role common to two principals, the rule is much the same. That is, notice to, or knowledge of, an agent will be considered to be notice to, or knowledge of, both principals except [*45] in a situation of divided loyalties or where the agent's own interests run adverse to one of the principals. [77]

76   *Albert*, 2005 Del. Ch. LEXIS 133, 2005 WL 2130607, at *11 ("Delaware law states the

knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal."); *Ambrose v. Thomas*, 1992 Del. Super. LEXIS 116, 1992 WL 208478, at *2 (Del. Super. Mar. 13, 1992) ("In Delaware, well settled agency law provides where an agent acquires knowledge in the course of his or her agency and has no personal interest in the transaction adverse to the interest of the principal, any knowledge of or notice to the agent is chargeable to the principal whether or not knowledge or notice is actually communicated to the principal. This rule promotes the underlying policy of holding accountable one who transacts his business through another for what the other does or does not do in conducting that business. The principal should bear the burden rather than a third party who has dealt with the agent to the third party's detriment.") (internal citations omitted).

77   See *Holley v. Jackson*, 39 Del. Ch. 32, 158 A.2d 803, 808 (Del. Ch. 1959) ("Ordinarily the knowledge of an agent is imputed to his principal . . . [but] where an agent [*46] is interested in the result of a transaction adversely to the interest of his principal, the rule of imputed knowledge on the part of the principal no longer obtains.") (citations omitted).

Dickerson was representing NASC; that is not disputed. NASC seeks to limit his role to that of "deal counsel." The question, however, is whether Dickerson's knowledge of the revision to Section 5.10 of the Merger Agreement through the Third Amendment (a revision which Dickerson himself accomplished) can be attributed to NASC within the context of whatever attorney-client relationship may have existed between NASC and Troutman Sanders. The Complaint carefully and somewhat flimsily--but sufficiently--alleges facts that would support an inference--one that must be given in the "plaintiff-friendly" confines of Court of Chancery Rule 12(b)(6)--that, during the evening of November 20, Dickerson was somehow conflicted because of his role as "deal counsel" and the payment of his fees by Pearl (or its related entities). In the appropriate factual setting, the knowledge of a conflicted agent may not be imputed to the principal. That, accordingly, precludes the Court from attributing Dickerson's knowledge [*47] to NASC. 78

78   It may turn out that Dickerson's conflict, if indeed there was one, was limited or minimal or was understood and accepted by NASC and, thus, would not preclude imputation of his knowledge to NASC. It may also be that Pearl was entitled to rely upon Dickerson's apparent authority or that it reasonably assumed that Dickerson would share any material information regarding the transaction with Goldsmith, his partner. Those are arguments-however tempting--that the Court may not reach at this stage of the proceedings because of the incomplete development of the factual background.

Accordingly, the Complaint states, perhaps only marginally, a claim for reformation of the Third Amendment for the benefit of NASC. 79

79   The Complaint was carefully drafted with respect to Dickerson's role. It alleges that he did not have the authority to bind NASC. It alleges that he was paid for some of his work by Pearl or its related entities. It alleges that he was "deal counsel," but it provides no basis for gaining a full understanding of Dickerson's role. Without an understanding of Dickerson's actual role, it is difficult for the Court, within the confines imposed by Court of Chancery Rule 12(b)(6), [*48] to determine whether or not Dickerson had the authority to do what he did or, more importantly, whether Dickerson's knowledge may be imputed to NASC. Because the Court must give NASC the benefit of any reasonable inference that can be drawn from the allegations of the Complaint, the Complaint must be read to suggest that Dickerson was somehow conflicted and that his conflicted status would make it improper or inequitable to attribute his conduct or his knowledge to NASC, even though the Complaint scrupulously avoids any such express allegation and that inference is far from the one most likely to be drawn from the allegations of the Complaint. Ultimately, Dickerson's role will be a factual matter, one informed by an understanding of the ethics of the practice of law, and, if NASC has no more to offer than what has been set forth in its Complaint, its claim for reformation might fail not only because it is fairly charged with Dickerson's knowledge, but also because it is bound by Dickerson's conduct. NASC's position must be something more than a whine that it did not like what its lawyer did

during the final hours of negotiation of the Third Amendment. Parties to a transaction and their [*49] counsel must be able to rely--and to act accordingly--on the negotiating authority generally accorded transactional attorneys. This is especially true when the negotiations are ongoing and the principals have abandoned the negotiation field after leaving signature pages. Nothing in this Memorandum Opinion should: be viewed as undercutting that dynamic. The result here is more the product of Court of Chancery Rule 12(b)(6) than it is of substantive law.

Also, the Court expresses no view as to whether the reformation sought by NASC would bring the substantive result--Pearl's obligation to pay MetCap--that it seeks.

On the other hand, MetCap's effort to obtain reformation fails. MetCap is a party neither to the Merger Agreement nor to the Third Amendment. Reformation is available, perhaps subject to certain exceptions not present here, only to parties to the contract. [80] As such, MetCap, as a matter of law, may not pursue a claim for reformation of the Third Amendment.

> 80   See, e.g., Emmert v. Prade, 711 A.2d 1217, 1219 (Del. Ch. 1997); Fritz v. Nationwide Mut. Ins. Co., 1990 Del. Ch. LEXIS 193, 1990 WL 186448, at *3 (Del. Ch. Nov. 26, 1990); but cf. Chase Manhattan Bank v. Iridium Africa Corp., 307 F. Supp. 2d 608, 614 n.6 (D. Del. 2004).

## V. [*50] CONCLUSION

For the foregoing reasons, (i) Count One (Fraud) and Count Three (Third-Party Beneficiary) of the Amended Complaint will be dismissed; (ii) Count Two (Unjust Enrichment) of the Amended Complaint, except to the extent that it purports to assert a claim against Pearl based on benefits conferred after the Third Amendment to the Merger Agreement, will be dismissed; (iii) MetCap's claim for reformation presented in Count Four will be dismissed; and (iv) otherwise, Defendants' Motion to Dismiss will be denied. An implementing order will be entered.