defendant's principal, Mr. Silver, through another company, signed a second amendment or was involved in a negotiation and signed a commitment letter in connection with a second amendment to the merger agreement. Under that second amendment to the merger agreement, Mr. Silver's company was going to be putting up $350 million in equity and he was going to buy North American Senior Care, which had that obligation to pay Metcap.

THE COURT: That's the total value of the merger?

MR. STEIN: No, the merger was valued at over $2 billion.

Your Honor, at that time when the second amendment was signed with Mr. Silver's approval, nobody said anything about a problem with Section 5.10. In fact, under the commitment letter that Mr. Silver's company -- named Filmore at that time -- signed, Mr. Silver's company was going to buy North American Senior Care.

Later the deal was changed slightly because it was determined to change the names of the acquiring companies; so NASC became Pearl, NASC Acquisition became PSE Sub, and there was another party, S Bev, that became Geary. Those are the defendants. But that was a name change, it was not a substantive change to the notion that these new assignees or Mr. Silver's company were going to assume the obligation to Metcap.

But the point is, and the main point is that even if

everybody, all the parties had agreed, Metcap didn't agree and nobody, nobody claims that they ever contacted or discussed this issue with Metcap, nobody claims that they ever discussed this issue with Metcap counsel, nobody claims that this issue was ever discussed with Wachovia, which was also not a signatory to the agreement. This was just a late night change to try and eliminate obligations to Metcap and Wachovia done for the first time at 12:59.

THE COURT: And Wachovia didn't join you in this action?

MR. STEIN: No, they settled with Wachovia. They settled in this action, that's our understanding.

Your Honor, our obligation to Metcap was admitted by Mr. Silver, there's an affidavit that we submitted, a one-page affidavit by Mr. Jack Dwyer, which we submitted. He said I am the president of Capital Funding, Inc., and in that affidavit, he acknowledges that when he says that Mr. Silver admitted to him on several occasions that he understands that he has an obligation to Metcap and/or Mr. Grunstein. That is in one of the papers that we submitted yesterday.

Your Honor, at the end of the day, the way things stand, if defendants have their way, the obligation to pay Metcap still rests with North American Senior Care, the obligation to pay Wachovia still rests with North American Senior Care, which is not released -- which has not obtained a

release from anyone, even on the Wachovia side, and North American Senior Care was a special purpose entity created solely for purposes of this merger, and North American Senior Care simply does not have assets.

I would like to make two more points, if I may, your Honor. The defendants also say that they have no interest in the fund for which the attachment is sought. That is wrong on two points; number one, this was a fund which Metcap helped create. These are the proceeds of the merger, and Metcap is looking to collect its fee from that fund which it helped create.

Secondly, your Honor, they cite to a pay-out agreement, Mr. Heil cites to a pay-out agreement which says that any left-over funds after the shareholders in Beverly are paid out is escheated to the state. However, under that same pay-out agreement, Pearl, one of the defendants, has the right, has the right to terminate the agreement. In which case the funds go back to the defendants.

Lastly, your Honor, there is a statement that well, an attachment is not necessary because we can pay judgment; even in the unlikely event there is a judgment for $20 million, we can pay it.

Your Honor, those are simply conclusory statements. There's not a word about the net worth of the defendants. These were special purpose entities. There is not one word

with respect to what debt they are saddled with. So we have very real concerns that, at the end of the day, assuming Metcap wins, Metcap will only be left to this fund to collect from.

Thank you, your Honor.

THE COURT: Thank you, Mr. Stein.

MR. DONLEY: Good morning, your Honor.

THE COURT: Good morning.

MR. DONLEY: Let me turn first to the question of the forum selection clause, because we believe that the Court really need go no further than that clues to decide the motion before you this morning.

And I think it's clear, based on what Mr. Stein said, that there is absolutely no issue that the forum selection clause requires two of the three plaintiffs here, the North American plaintiffs, to proceed in Delaware, which they obviously have not done. So those claim of those plaintiffs are dismissible on that ground. They're also dismissible on other grounds as well.

It is true that the third plaintiff, Metcap, did not sign the merger agreement. Nonetheless, the entire claim they present here this morning is based on the merger agreement, and we believe under those circumstances where they're laying claim under a document that has a forum selection clause and they claim to have been aware in detail of the provisions of that merger agreement, they too are bound by it. And we have

addressed that in I believe it's footnote nine of our brief. So we think the Metcap claim as well is dismissible under the forum selection clause.

But let me turn to the merits of the motion for an attachment. Under New York law, Metcap, which is the only party moving for an attachment, has to demonstrate three things to get an attachment; it has to show that it has a probability of success, it has to show that there is a need for the attachment, and it has to show that there is an asset in New York that is attachable. And we submit they have not satisfied any of those legs of the standard that governs attachment in New York.

Let me turn first to the issue of probability of success. As I mentioned, we think all three claims of the plaintiffs' are dismissible under the forum selection clause, but let me turn to the merits of the contract claim that Metcap asserts. And what you see here, your Honor, is that there are three layers, three stories to a scaffold that they're trying to build to suggest that the defendants have liability to them. And the first layer is a contract they say exists not between any defendant at Metcap but rather between the plaintiffs, North American and Metcap.

Now your Honor, we believe, although we don't know the facts for sure, we believe that Metcap and North American are actually affiliated. We believe Mr. Grunstein, who has already

submitted three affidavits in this case but has in none of those affidavits acknowledged a relationship with Metcap, in fact has an interest in Metcap.

THE COURT: Who is Mr. Grunstein?

MR. DONLEY: Mr. Grunstein.

THE COURT: Who is he?

MR. DONLEY: Mr. Grunstein is the principal of a company called SBEV, which had a role in the merger agreement, but he is also a partner in Troutman Sanders.

THE COURT: Troutman Sanders?

MR. DONLEY: Troutman Sanders.

THE COURT: Do you accept counsel's statement he was deal counsel?

MR. DONLEY: Absolutely not, your Honor. We think it's clear they were counsel to North American. They may well have functioned as counsel to Metcap, but no. And indeed, if you look at their papers, there is nothing --

THE COURT: In any event, you're saying he wasn't counsel to the defendants?

MR. DONLEY: That's absolutely correct.

THE COURT: Who was?

MR. DONLEY: My firm, Dechert, was counsel to Pearl, which was formed for the purposes of consummating this merger. After we acquired Beverly, then it became a subsidiary to Pearl, we became counsel to Pearl. Before that, Latham &

Watkins was counsel to Pearl.

But looking at this first layer of the contract dispute, what you see is that essentially there's a negotiation between two parties of the same entity, Metcap and North American, that are affiliated. And for the first time last night we got a copy of the contract that they say entitles Metcap to $20 million. And I believe it was handed up, or the affidavit to which it is attached was handed up this morning.

And the first thing you notice about that contract is that it does not have a date. There is no date on this contract that says they get $20 million, except a fax line with the date of March 2006. They say that contract was entered in August of 2005, but there's no proof of that.

The second thing you notice --

THE COURT: A contract without a date. Is it signed?

MR. DONLEY: It is signed. It is signed by North American and by Metcap.

The second thing you notice, of course, is that there's no defendant who signed that agreement, that's between two plaintiffs.

And the third thing you notice is that what it says is when and if North American acquires Beverly, then Metcap gets a $20 million fee. It doesn't say they get paid no matter what, it says if Metcap assists in a transaction in which North American acquires Beverly, then Metcap gets paid. So that's

the first layer of the contract analysis.

The second layer that plaintiffs say is necessary, their own papers say is necessary, is that Beverly, which is a public company operating nursing homes, which was the intended partner to this acquisition by North American, essentially a deal with a public company that is going private, North American would pay the shareholders and Beverly would become owned by North American, but there is absolutely no proof that Beverly ever agreed to pay Metcap anything.

They say when you look at this merger agreement, which was signed in August of 2005, and you look at this clause 5.10, it reflects an obligation by Beverly to pay Metcap. But in fact, it's just the opposite, your Honor. That clause is designed to assure that Beverly doesn't have to pay. It's a standard no broker clause which you often see in deals like this saying if some broker comes out of the woodwork, we're not going to be obligated for it, that's your responsibility, North American.

And that's what they say. They say that somehow, although we can't prove it, before we signed the merger agreement, Beverly agreed to share in this $20 million obligation. But when we signed the merger agreement, Beverly shifted the obligation to North American.

So on their only analysis, Beverly no longer had an obligation. We submit, your Honor, there was never any proof

they had an obligation. And why the acquired company, the target, would agree to pay the fees of the acquiring company is a mystery.

The third analysis, the third layer of the contract analysis involves my clients for the first time. For the first time my clients, Pearl Senior, sign a piece of paper in November of 2005. And I don't think it's surprising to anyone that as this deal evolves and it becomes clear that North American cannot consummate the deal, and there's a discussion with my client about taking over the position of North American, that at some point my client sits down and says: Well, if I'm taking over this agreement, I'm going to sit down and scrutinize it. And that's what happened over the weekend of November 20th, 2005.

And at that point, your Honor, I would submit to you that North American was somewhat low on leverage and high on risk. It had signed a deal, a merger agreement, in which it committed to deliver financing instruments that showed it could close this deal, and it was due to perform under those on that weekend, on November 20th.

And so the discussion progressed, and my client, which had provided financing earlier to North American, was providing some of the equity money; North American was going to get the rest of the money elsewhere. My client takes an interest in taking over the agreement, and ultimately that happened. And

the discussion that weekend, by all accounts, the discussion is between my partner, Joel Heil of the San Francisco office, representing Pearl River, the company considering taking over the position of North American, and Troutman & Sanders, who was functioning as counsel for North American.

Troutman & Sanders was using one of their senior partners, Brinkley Dickerson, to conduct the negotiation. Brinkley Dickerson is the partner of Mr. Grunstein, and he is also the partner of Mr. Goldsmith. Those are the parties, Mr. Goldsmith and Mr. Grunstein, who now say Mr. Dickerson, their law partner, had no authority to negotiate with my partner over this contract.

They acknowledge that at a late point in the evening, as the parties were trying to consummate this deal, Mr. Heil said to Mr. Dickerson: We're not willing to keep this clause in here, this clause that you folks think somehow requires the new person taking over North American's position to pay Metcap, we don't want any doubt about that, we're taking that clause out. And Mr. Dickerson says fine. That's the record before you. They don't dispute that.

What they say is Mr. Dickerson wasn't supposed to do that. Mr. Dickerson, who is actually at the firm of Troutman & Sanders longer than Mr. Grunstein and Mr. Goldsmith, he's not supposed to continue that negotiation. Mr. Grunstein and Mr. Goldsmith, by their own accounts, left signature pages in