# EXHIBIT G

STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
METCAP SECURITIES LLC, NORTH AMERICAN  :
SENIOR CARE INC., and NASC ACQUISITION
CORP.,                                 :
                                                                    06 Civ. 2336
                       Plaintiffs,     :
                                                                    Judge Casey
        - against -                    :
                                                                    SUPPLEMENTAL
PEARL SENIOR CARE, INC.; PSC SUB INC.; :                            DECLARATION OF
GEARY PROPERTY HOLDINGS, LLC; and                                   LEONARD GRUNSTEIN
BEVERLY ENTERPRISES, INC.;             :

                       Defendants.     :
------------------------------------------------------------------ X

Leonard Grunstein declares under penalty of perjury:

1.     I submit this supplemental declaration in further support of MetCap's motion for an attachment and specifically in response to the declarations of Ronald Silva and Joseph Heil. The facts set forth below are based on my personal knowledge and/or the documents referred to herein.

2.     This action and the motion for an attachment arise, in part, out of the purported deletion of the parenthetical in Section 5.10 of the Merger Agreement dated August 16, 2005. As set forth more fully in my initial affidavit, this deletion was done by defendants by means of the unauthorized insertion of a new Section 3.9 in the version of the Third Amendment published at 12:59 a.m. on November 21, without the knowledge or consent of plaintiffs, MetCap or Wachovia, and <u>after</u> signature pages for NASC and SBEV had been delivered in connection with (and, in effect, attached to) a prior version of the Third Amendment, that did not contain this new Section 3.9. Defendants' conduct had the purpose and effect of impairing the rights of parties to the Merger Agreement, and third party beneficiaries thereof, without their knowledge or consent.

3. Section 5.10 of the Merger Agreement provides that:

> "No broker, finder, financial advisor, investment banker or other person (other than Wachovia Securities and MetCap Securities LLC, the fees and expenses of which will be paid by Parent) is entitled to any brokerage, finder's, financial advisor's or other similar fee or commission in connection with the merger." [Emphasis Added.]

NASC is the "Parent" under the original Merger Agreement and Pearl is substituted in place of NASC as the Parent under the Third Amendment. Section 3.9 of the Third Amendment (Exhibit 4) purported to delete the parenthetical in Section 5.10 of the Merger Agreement and thus the obligation of the substitute Parent, Pearl, to pay these obligations at the closing.

4. The fee which MetCap was entitled to was $20 million. It was also entitled to reimbursement of its expenses. Interestingly, defendants or their principals paid MetCap most but not all, of its expenses, a fact that is totally at variance with the position espoused by Mr. Heil and Mr. Silva. Although both Mr. Heil (para. 9) and Mr. Silva (para. 4) claim never to have seen it, the $20 million fee was reflected in an agreement between MetCap and NASC (and guaranteed by SBEV, of which I am manager), a copy of which is annexed hereto as Exhibit 9. The agreement provides for the fee of $20 million to "be paid simultaneously with the closing . . . . out of the proceeds of any debt or equity financing of the [Beverly] Business Combination Transaction."

5. In paragraph 6 of his declaration, Joseph Heil, the attorney for defendants, states:

> Some time on Sunday (November 20), possibly into Monday morning, it was noticed that there was a clause in Section 5.10 of the Merger Agreement that referred to, inter alia, payment of fees to MetCap by North American and I was unaware of any fee arrangement between MetCap and North American. [Emphasis Added].

The impression created by this statement is that the defendants Pearl, PSC and Geary first became involved in this transaction on the weekend of November 18-21, 2005; that at the

2

eleventh hour (or more accurately, at 12:59 a.m. on the morning of November 21, 2005), and after, in effect, the Third Amendment was signed by NASC, they "noticed" for the first time, Section 5.10 of the original Merger Agreement; and which they allege they therefore deleted. As documented below, that impression is false and they had no right unilaterally to delete this provision or impair the rights of NASC, MetCap or Wachovia. Interestingly the very same parenthetical also protects the rights of Wachovia. Although neither Mr. Heil nor Mr. Silva make mention of this in their declarations, it is impossible to ignore the fact that the source of Pearl's obligation to Wachovia is set forth in Section 5.10 of the Merger Agreement. Mr. Silva also sought to deny any obligation of Pearl to pay Wachovia's investment banking fee and expense. (Nevertheless, Mr. Silva sought to settle the obligation to Wachovia, because there was no denying the same. I am informed that the Wachovia claim was settled on the basis of a reconfirmation of the obligation and payment of ½ the fee due (i.e., $3 million out of $6 million) and a commitment to issue an investment banking credit letter acknowledging Wachovia's role as an investment banker in the deal.)

6. Although the original Merger Agreement was signed on or about August 16, 2005, beginning a number of months earlier, I had been involved in negotiations with Mr. Silva and Mr. Heil for Mr. Silva's company (Fillmore Capital) to provide the equity for the transaction (see, e.g., e-mail dated July 13, 2005, annexed as Exhibit 10). As part of this process, Messrs. Silva and Heil were sent, and they reviewed, drafts of the Merger Agreement.

7. Thus, on August 15, 2005, I e-mailed both of them copies of a draft of the Merger Agreement prepared on August 13th. (Exhibit 11) This draft, as well as all subsequent drafts, contained Section 5.10 (providing that NASC would pay Wachovia and MetCap their fees and expenses). On August 16, 2005, Mr. Heil asked me to send him the "latest" merger agreement

3

blacklined against the last one you sent us [on August 15th] (Exhibit 12). At about 2:56 p.m., my law partner, Lawrence Levinson, Esq. e-mailed Mr. Heil the "latest [draft] I have" which came in "11:00 P.M. the night before (Exhibit 13). Once again that draft (Exhibit 14) also contained the same Section 5.10.

8.  At 3:27 p.m. on August 16th, the date of the Merger Agreement, Mr. Silva e-mailed me that "Joe [Heil] is . . . moving through the M[erger] agreement" and that "we need until the AM [on August 17th] to be in a position to fund (Exhibit 15). On August 17, 2005, my secretary, Eileen Reyes, e-mailed a copy of the executed Merger Agreement to Messrs. Silva and Heil (Exhibit 16). Once again, the executed version contained Section 5.10. How Mr. Heil can claim that he only first noticed this provision, for the benefit of Wachovia and MetCap, on November 21, 2006 is beyond all reason. It is just not credible as shown below. Later in the day on August 17th, Messrs. Heil and Silva participated in a conference call "to go over the merger agreement" (Exhibit 17). Thus, between August 15 and August 17, 2005, Mr. Silva and Mr. Heil had received and reviewed at least two interim drafts and a third executed version of the Merger Agreement, all of which contained Section 5.10 and its reference to the MetCap (and Wachovia) fees and expenses.

9.  Both Mr. Heil and Mr. Silva and their team of attorneys at Dechert, obviously reviewed the Merger Agreement in detail. Indeed, on August 17th, Mr. Silva complained to me about the provisions in the Merger Agreement regarding appraisals (Exhibit 18). Later that day Mr. Heil sent a draft of a pledge agreement based on the Merger Agreement, "relating to Fillmore's investment in the Beverly deal" (Exhibit 19). Thereafter the Merger Agreement was amended, as described below. In connection with the First Amendment, neither Mr. Heil nor Mr. Silva raised any issue as to Section 5.10.

4

10. More importantly, on or about September 22, 2005, the Second Amendment to the Merger Agreement was executed (Exhibit 20). Once again neither Mr. Heil nor Mr. Silva raised any issue as to Section 5.10. Although not a direct signatory to the Second Amendment, Mr. Silva and Mr. Heil were intimately involved in the negotiations of the Second Amendment which was principally for the benefit of Mr. Silva and Fillmore Capital Partners. Mr. Silva and Mr. Heil reviewed drafts of the Second Amendment (Exhibit 21). Indeed, Mr. Silva provided the Equity Commitment Letter in the form attached to the Second Amendment as Exhibit C", which Mr. Heil negotiated. Section 2.11 of the Second Amendment provides, inter alia, that by November 18, 2005, NASC would deliver "a further updated Equity Commitment Letter in the form attached hereto as Exhibit C, but with the condition set forth in Section 2(iii) thereof removed." Pursuant to paragraph 1 of the Equity Commitment Letter, Fillmore agreed to purchase the "common stock and preferred stock of Parent or LLC interests of SBEV" for at least $350 million, and "to cause Parent and/or SBEV, as the case may be, to make the proceeds of such purchase available as consideration for the Merger."

11. It was, therefore, as a part of the Second Amendment that Mr. Silva and Fillmore made the equity funding commitment and not, as Mr. Silva and Mr. Heil would have us believe, almost two months later in connection with the Third Amendment. The issue which Mr. Heil raised on November 21st, regarding Section 5.10, was one that, if it were a real one and not a contrived one, should have been raised in September, at the time of issuance of the Equity Commitment Letter under the Second Amendment. Nevertheless, Mr. Heil and Mr. Silva would have us believe that it was only after another two months, (and then only after Mr. Goldsmith and I executed signature pages), sometime around midnight on November 20th or very early on the morning of November 21, they first learned of the role of MetCap (and Wachovia) and the obligation in paragraph 5.10 to pay its fee and expenses and that prior thereto they knew nothing

5

of the existence of MetCap's role or of Section 5.10 of the Merger Agreement. Moreover, Mr. Heil would also have us believe that this was not a business issue for discussion among principals and that, in effect, Mr. Silva should not be the one to speak to his counterparts, the other principals. Rather, Mr. Heil argues that he, as lead deal counsel should only speak to the person at Troutman (his co-deal counsel) he chooses to speak to, namely Brink Dickerson. Mr. Heil's actions disregard the fact that principals of both NASC and SBEV could have been reached by phone and indeed were reached by phone at about the same time to discuss other matters. Mr. Heil would have us believe that both he and Mr. Silva are perfectly justified in asserting that there is no obligation to Wachovia or MetCap, despite the express provisions in the Merger Agreement to the contrary. What was required to delete the parenthetical was an express agreement among the parties, including the plaintiffs and MetCap and Wachovia; no other way is legally possible or morally appropriate. MetCap brought about this transaction, negotiated and obtained the Merger Agreement, financing commitments and other essential elements, so as to consummate the transaction and there is just no basis to suggest that it is not entitled to its fee. The fee is fair and reasonable. Indeed, just from sourcing the financing commitments above, the fee was all or substantially all earned; and when appropriate compensation for obtaining the deal is factored in, it may be argued that the fee was too low under the circumstances.

12. The Second Amendment made no reference at all to any change to Section 5.10 of the Merger Agreement, because that was never the deal. Section 5.10, therefore, remained in the form set forth in the Merger Agreement, unchanged. Consequently, as of the execution of the Second Amendment, the obligation to pay MetCap and Wachovia remained intact, with the full knowledge and consent of Mr. Silva. In fact, pursuant to the Second Amendment, Mr. Silva's company was going to buy the stock of NASC (which had agreed to pay MetCap its fee and

expenses) and membership interests in SBEV, (which had guaranteed such payment obligation by NASC). Thus, not even Mr. Silva can deny that as of September 22, 2005, he knew and agreed that the "Parent" under the Merger Agreement was to pay the MetCap (and Wachovia) fees and expenses at closing.

13. The Fillmore Equity Commitment Letter dated September 22, 2005 that was signed by Mr. Silva and delivered to NASC, as described above, provided for:

> "the Sponsor ("Fillmore") obtaining, on or before November 18, 2005, the agreement from an investment source which has been identified by Sponsor to the Company (Beverly) as of the date hereof, to provide funds necessary to consummate the purchase of the Equity Securities, and to no other conditions or restrictions whatsoever.

In November 2005, prior to signing the Third Amendment, Fillmore was able to confirm the allocation of amounts to its fund more than sufficient to cover its $350 million equity commitment and, thus, satisfy the condition in the Equity Commitment Letter, as required by Section 2.11 of the Second Amendment.

14. It was my suggestion at the time, that we change the names of the acquiring entities under the Merger Agreement. Accordingly, Pearl and Geary, respectively were formed and substituted as counterparts to NASC and SBEV, just two days prior to the Second Amendment (Exhibit 22). As can be seen from the attached e-mails (Exhibit 23), there were many different names suggested; but there was no change in substance – it was merely a name change. We did this only to differentiate the merger parties from the originally proposed equity source, Rubin Schron. It seems that confusion had been caused by representatives of the plaintiffs' bar, who sought first to link the situation at Mariner Health Care Corp., while it was a public company, to Mr. Schron, (as a principal of an entity that purchased fee title to nursing homes from Mariner) and then to link the acquirors of Beverly to Mariner, both because of the alleged tie, through Mr. Schron's involvement, and because of the use of a similar structure to

Mariner. My suggestion sought therefore to establish a new identity for the acquiring parties. There was not to be any change in the ownership or structure of the deal. Indeed, nobody could suggest otherwise, given the lack of a purchase and sale agreement between the parties and any consideration for the supposed assignment. The assumption language is both simple and powerful, i.e., whatever the obligations under the Merger Agreement of NASC and SBEV, they were assumed by Pearl and Geary, respectively, without change.

15.   Contrary to the statement in paragraph 4 of Mr. Heil's declaration, there were no "multiple steps". Mr. Silva had been involved in the Beverly transaction from almost the very beginning and certainly by the time the Merger Agreement was signed. The actual form of the Equity Commitment Letter was negotiated as early as in August 2005 and the structure of Mr. Silva's participation in the equity through Fillmore, was unchanged from inception. NASC made a deal with Fillmore and it honored that deal. It is just inappropriate for Mr. Heil to suggest that it somehow became apparent in mid-November that NASC was not going to be able to provide the equity; this was just not so and not the deal. Annexed herewith as Exhibit 24 is a copy of a presentation made by Fillmore that unequivocally shows that even in early September, Fillmore was providing the equity. The Third Amendment was not intended to change the structure of the transaction, as outlined in the Second Amendment. Just as Fillmore was the equity source pursuant to the Second Amendment and remained so under the Third Amendment, the newly named entities were substituted for and played the very same role as their counterparts. And, just as NASC had been obliged to pay the MetCap and Wachovia fees and expenses under Section 5.10, so too was Pearl required to do so under Section 5.10, unchanged by any amendment. Thus, whether it is the Second Amendment (pursuant to which Mr. Silva's company was to be the equity source to NASC that had the obligation), or the Third Amendment where this obligation, like others under the Merger Agreement, was assumed by Pearl as the