substitute Parent, there is no basis to suggest that this obligation does not have to be met. The Third Amendment was not intended to and did not deal with 5.10. The Third Amendment was intended to and dealt with the price change and the resolution of certain tax issues. It incorporated the name change as a convenience to the parties.

16. As far as the deletion of the parentheticals in Section 5.10 of the Merger Agreement is concerned, Mr. Heil does not deny that he never discussed the deletion with Mr. Goldsmith or with me. Instead, he says he told Mr. Dickerson of Troutman Sanders to make the change. Mr. Heil contends that he understood that Mr. Dickerson "was representing North American, as he had previously, and had the authority to negotiate for North American." (Heil Dec., para. 6) This is simply not true. Moreover, even Mr. Heil does not have the temerity to suggest that Mr. Dickerson could actually sign for NASC. Therefore, how could he then, in effect, assert that delivery of signature pages without express authority, is anything other than in effect Mr. Dickerson signing for NASC? The answer is that he did not have such authority and could not do so. Indeed, even Mr. Dickerson sought an express authorization from the parties to release their signatures as shown in the e-mail annexed hereto as Exhibit 25; and this did not occur, because the parties never consented thereto. All that seems to have happened is that the signature pages were, in effect, removed from a prior version of the Third Amendment, without any change to Section 5.10 and, in effect, attached to the unauthorized version, without the knowledge or consent of plaintiffs, MetCap or Wachovia. Therefore the new Section 3.9 relating to Section 5.10 of the Merger Agreement, that defendants sought to insert into the Third Amendment, should be deemed null and void and of no further force and effect, and Section 5.10 should be enforced without change for the benefit of plaintiffs against defendants.

17. Troutman Sanders, like Dechert were deal counsel. Troutman Sanders did not represent the partners in the deal, or for that matter, MetCap or Wachovia, as well. Indeed, neither NASC nor MetCap are clients of the firm.

18. Mr. Dickerson was not representing NASC with respect to the Third Amendment. Indeed, it was Mr. Silva's company which paid Troutman Sanders for the work that Mr. Dickerson did that night. Moreover, while under the structure in place prior to Mr. Silva's entry in the deal, NASC was to be owned by a third party with his own counsel, from and after Mr. Silva's entry to the deal, he wished to acquire NASC (see Exhibit 20, Exhibit C, para. 1). Therefore, it was Dechert as lead counsel and Troutman as co-counsel that, in effect, represented both NASC and SBEV, on the one hand, and Pearl and Geary, their substitute namesakes on the other hand, as a combined legal team. It is just facetious to suggest that Troutman represented NASC and Dechert did not.* In effect, it was either both firms or neither firm, but not one or the other. Mr. Dickerson had no authority whatsoever to bind plaintiffs, MetCap or Wachovia. In the absence of their express agreement, which was never given with respect to the deletion of the parenthetical of Section 5.10 of the Merger Agreement, no such agreement is binding, even if, as Mr. Heil suggests, Mr. Dickerson was authorized to negotiate. Neither Mr. Heil nor Mr. Dickerson ever discussed any issue as to Section 5.10 with Mr. Goldsmith or with me at any time prior to or during the period of November 18-21 or even thereafter. It was only very recently when the issue was raised, as described herein, by Wachovia, that I and others first learnt of the unauthorized change.

19. None of NASC, SBEV, MetCap and Wachovia consented to the change or even had knowledge thereof at the time. Significantly, the version of the Third Amendment

---

* Plaintiffs intend to make a motion to disqualify Dechert based inter alia on the fact that their representation of defendants is adverse to their prior representation.

10

containing the unauthorized change as to Section 5.10 was not even sent to Mark Goldsmith, who was the signatory for NASC, the Parent under the Merger Agreement that expressly had the obligation to Wachovia and MetCap under Section 5.10.* Absent the attempt unilaterally to change the text of the Third Amendment, it was always intended that all of the obligations of "Parent" under the Merger Agreement be assumed by Pearl, as the substitute Parent. That is what the Third Amendment expressly says.

20. On November 20, 2005, at 9:36 p.m., Mark Goldsmith circulated an email stating that he was "signing off the computer for now. If you need me, the phone numbers are:

> 201-836-4459
> 201-836-1023
> 551-206-3205"

(Exhibit 26). Nobody ever called Mr. Goldsmith about Section 5.10 or even sent him a copy of the 12:59 a.m. draft of the Third Amendment. They did call him and e-mailed him about other things; but not about Section 5.10. (See Supplemental Declaration of Mark Goldsmith.)

21. I discussed many items with Ron Silva and Joe Heil that day. During the course of the day and until about 10:00 p.m. that evening or somewhat later that night, I was involved in negotiating and obtaining the revised CS and Cap Source Commitments and the revised Houlihan Lokey Opinion. I was also involved in negotiating and obtaining the Omnicare expression of interest letter. I was coordinating the negotiation of the Third Amendment including orchestrating communication with the chairman of the Board and representatives of management of Beverly that resulted in agreement to the price change and other favorable

---

* Mr. Heil's statement (in paragraph 4) that NASC "was released from its obligations under the Merger Agreement is misleading". Only Beverly released NASC: MetCap and Wachovia did not (see Exhibit E, page 15, Section 4.4(b)). Unless defendants are required to assume the obligation, NASC is liable for the MetCap and Wachovia fees.

11

resolutions of the tax issues. Yet, throughout this long day and night, neither Joe Heil, nor Ron Silva or their proxies discussed this purported change of Section 5.10 with me.

22. The absence of any authority by Mr. Dickerson to agree to any changes without the express approval of NASC or SBEV is underscored by the fact that my signature and the signature of Mr. Goldsmith were delivered in escrow and were not to be released without our express authorization. We only agreed to release them with respect to a prior version of the Third Amendment, before any purported change to Section 5.10. This is all the more underscored, even by Mr. Dickerson himself, in his e-mail of 4:07 a.m. on November 21 (Exhibit 25) when he specifically said that our signatures were to be held in escrow until expressly released by Mark and me, and this never occurred. Our signatures were then, in effect, removed and reattached to a changed version, without our authorization or consent.

23. The actual signature pages to the Third Amendment (Exhibit E to his declaration) support my position. Thus, the signature page for Mr. Goldsmith (on behalf of NASC) and me (on behalf of SBEV) have a small footer in the lower left hand corner of the document, indicating its word processing identification number. No other page in that entire document contains such a notation.

24. The footer on our signature page is NY:489988-5. This is the exact identification number that appears on the first page of the draft sent at 9:04 p.m., which did not contain the new Section 3.9 (see Exhibit 4, page 1 of draft). Since, the documentary evidence shows that Mr. Goldsmith (and I) left the office several hours before the 12:59 a.m. draft was circulated and that draft was never even sent to Mr. Goldsmith, it is unassailable that Mr. Goldsmith and I, in effect, signed a prior version that did not provide for the deletion of the parenthetical, and that our signature page was, in effect, later removed from the version we approved, and attached to a

12

later unauthorized version of the Third Amendment that purported to delete the parenthetical and which was not consented and agreed to by the plaintiffs, MetCap, Wachovia, Mark or me.

25.  Furthermore, beyond the fact that NASC and SBEV never agreed to or knew about the purported deletion of the parenthetical, neither did MetCap or Wachovia. Not even Mr. Heil claims that he consulted with MetCap (or Wachovia for that matter), or any attorneys for them, before instructing Mr. Dickerson to delete the parenthetical. Since, as discussed below, MetCap and Wachovia had brought about the transaction, were named in, relied on and assented to, Section 5.10 of the Merger Agreement of August 16, 2005, the parties to the Third Amendment did not have the right to delete the parenthetical even assuming arguendo that NASC had agreed to do so.

26.  Messrs: Silva and Heil definitely knew that MetCap was owed a fee at closing. Annexed hereto as Exhibit 27 is an email dated October 18, 2005 (sent to both of them), which enclosed a schedule of "Funds Required Through and Including Closing of the Merger Transaction". The third page of the first schedule lists the MetCap Advisory Fee. No dollar amount was listed, because, I am informed that, Ron Silva asked Larry Levinson (who prepared the schedule) not to put in the amount. Mr. Silva took the position that he would pay the MetCap fee, or give me a 50% partnership interest (which he had previously agreed to do), but not both. (See declaration of John Dwyer) However, Mr. Silva was most definitely aware that the amount of the fee was $20 million. Mr. Silva's statement (in paragraph 4) that he was not "aware" of the agreement between MetCap and NASC, is just not true is and belied by the fact that, among other things, he paid MetCap most of its expenses, negotiated various agreements involving for example the Deposit under the Merger Agreement with MetCap as a party to the agreement

13

relating to funding of the Deposit, and Mr. Silva authored or received numerous e-mails in which MetCap is described as being involved in this transaction.

27.     Nor do Mr. Heil or Mr. Silva deny that MetCap did work in connection with the transaction even after the Merger Agreement was signed, thereby manifesting MetCap's assent to and reliance on Section 5.10, and thus precluding the original parties to the agreement from deleting the parenthetical without MetCap's consent. Mr. Heil states disingenuously (in paragraph 6) that he was "unaware of any services that MetCap had provided to <u>Pearl Senior</u> and . . . of any said services provided after the execution of the Third Amendment". However, MetCap's entitlement to a fee was no longer subject to modification without its consent once the MetCap assented to and relied on Section 5.10, which was long before November 21st. Mr. Heil's statement that he is unaware of any services provided by MetCap after the execution of the Third Amendment is also untrue. Not only were valuable services rendered by MetCap, both before and after the execution of the Third Amendment, but, Mr. Heil was aware of the services being furnished and even requested me to cause at least some of such services to be furnished. The post Third Amendment services, among other things, related to: (a) the pharmacy arrangements; (b) supplier agreements; (c) the Fourth Amendment; (d) financing structures, the negotiation of revisions to financing commitments and of settlements; (e) revisions to the Houlihan Lokey Opinion and the underlying basis thereof; (f) valuation issues; (g) PLGL studies, industry trends and other analysis; (h) management and operational issues, projections of income and expense, the split up of assets and valuations of assets and liabilities (including contingent liabilities); (i) the benefits and burdens of doing business in various locales and structures designed to eliminate the problem of maintaining a headquarters presence in Arkansas without materially and adversely affecting any commitment to maintain a presence in Arkansas; (j) governmental matters; (k) union matters; (l) the resolution of restrictions on prepayment of

14

certain Beverly Debt or penalties in connection therewith and other financial aspects of the transaction; (m) evaluating alternative structures and financing strategies and negotiations with various financing sources; (n) other matters.

28. Not only was Mr. Silva aware of the services performed by MetCap, he was also aware that MetCap had advanced substantial sums of money both before and after August 16, 2005, including under Section 5.10 of the Merger Agreement in connection with the merger transaction, for which it was entitled to reimbursement. Annexed hereto as Exhibit 28, is an email dated December 21, 2005, from Brandon Ribar of Fillmore to Brink Dickerson, which states:

> Brink—we will be sending $1.5MM tomorrow morning to TS [Troutman Sanders]. I wanted to confirm that our payment is replacing an actual payment of $1.5MM by MetCap in October

There is also annexed hereto as Exhibit 29, an invoice, sent in response to Mr. Silva's request, of seeking reimbursement from Fillmore of an additional $400,000.

29. The statements by Mr. Silva (paragraph 5) that Pearl has no ownership interest in the bank account described in the motion, is disingenuous for at least two reasons. First, MetCap brought about this transaction and conferred a benefit on old Beverly and its shareholders and it is therefore entitled to collect out of the fund which MetCap helped generate. Second, while paragraph 10(h) of the Paying Agency Agreement (Exhibit F to Heil declaration) provides that the Bank of America shall "escheat" to the state any leftover funds, paragraph 12 of that same agreement allows Pearl to terminate the agreement, in which case the funds revert back to Pearl.

30. Finally, the statements by Mr. Silva (paragraph 3) and Ms. Williams-Vink (paragraph 3), that Pearl could satisfy a judgment of $20 million are conclusory only, and unsupported. There is no sworn statement of net worth and there is no mention of the amount of

15

any debt, let alone the very substantial acquisition debt of upwards of $2 billon, which burdens the defendants. Indeed, Mr. Silva only recently just told me that he cannot afford to pay a $20 million fee. Under the circumstances the money being held in New York may be the only money available to satisfy a judgment.

Executed under penalty of perjury
this 5th day of April, 2006

_____
Leonard Grunstein