EXHIBIT H

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| METCAP SECURITIES LLC and NORTH AMERICAN SENIOR CARE INC. )<br>)<br>)<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>PEARL SENIOR CARE, INC.; PSC SUB INC.; )<br>GEARY PROPERTY HOLDINGS, LLC; and )<br>BEVERLY ENTERPRISES, INC.; )<br>)<br>Defendants. ) | C. A. No. 2129-N |

## AMENDED COMPLAINT

Plaintiffs MetCap Securities LLC ("MetCap") and North American Senior Care Inc. ("NASC") by their undersigned counsel, for their Amended Complaint against defendants Pearl Senior Care, Inc. ("PSC"), PSC Sub Inc. ("PSC Sub"), Geary Property Holdings, LLC ("Geary") and Beverly Enterprises, Inc. ("Beverly") allege, upon knowledge as to themselves and their own actions and upon information and belief as to all other matters, as follows:

1. Plaintiff MetCap is a New York limited liability company with its principal business in the State and City of New York.

2. Plaintiff NASC is a Delaware corporation with its principal place of business in New York.

3. Defendant PSC is a Delaware corporation with its principal place of business in California.

4. Defendant PSC Sub is a Delaware corporation with its principal place of business in California and a wholly owned subsidiary of PSC.

5. Defendant Geary is a Delaware limited liability company with its principal place of business in California.

6. Defendant Beverly is a Delaware corporation with its principal place of business in Arkansas.

7. At all relevant times, Beverly, a publicly-held company, was a leading provider of quality healthcare to the elderly with approximately 345 nursing homes throughout the United States.

8. On or about August 16, 2005, Beverly entered into an agreement (the "Merger Agreement") with NASC, NASC Acquisition Corp. ("NASC Acquisition"), and SBEV Property Holdings LLC ("SBEV"), which provided for Beverly to be acquired in a merger-for-cash transaction and related transactions aggregating more than $2 billion. Mark Goldsmith signed the Merger Agreement on behalf of NASC and NASC Acquisition, and Leonard Grunstein signed the Merger Agreement on behalf of SBEV.

9. Plaintiff MetCap acted as the business and financial advisor in connection with the merger and related transactions contemplated thereby. Prior to August 16, 2005, NASC and Metcap entered into an agreement which provided that upon closing under the Merger Agreement, MetCap was entitled to be paid a fee of $20 million and expenses.

10. Under the terms of the Merger Agreement, the parties agreed, as between Beverly and NASC (which is sometimes referred to as "Parent" under the Merger Agreement) to shift to NASC the obligation of paying MetCap's fee and expenses. Accordingly, Section 5.10 of the Merger Agreement provided as follows:

> No broker, finder, financial advisor, investment banker or other Person <u>(other than Wachovia and MetCap Securities LLC, the fees and expenses of which will be paid by Parent)</u> is entitled to any brokerage, finder's, financial advisor's or other similar fee or commission in connection with the Merger based upon arrangements made by or on behalf of Parent or Merger Sub.

Under the terms of the Merger Agreement, NASC was the "Parent", which assumed the obligation to pay MetCap.

11. Although NASC was to acquire Beverly and had assumed the obligation to pay Metcap its fee, NASC was a special purpose entity, formed for the sole purpose of acting as a party to the Merger Agreement. It had no real assets of its own. At the time the Merger Agreement was signed, it was contemplated that NASC would meet its financial obligations (including the obligation to pay Metcap and Wachovia), by means of funds that it would raise in order to consummate the transactions which were the subject of the Merger Agreement.

12. Metcap was an intended beneficiary with respect to Section 5.10 of the Merger Agreement.

13. For several months prior to August 16, 2005, Mr. Leonard Grunstein (a principal of SBEV) had been involved in negotiations with Ronald Silva and his Company (Fillmore Capital) and their counsel (Joseph Heil of Dechert, which represents defendants in this action) to provide the equity for the Beverly transaction.

14. As part of these negotiations, Mr. Silva and his attorneys at Dechert were sent drafts as well as the final version of the Merger Agreement, which they reviewed in detail. At no time did Mr. Silva or his attorneys raise any issue regarding paragraph 5.10 of the Merger Agreement (providing that NASC would pay Metcap), which was contained in the drafts as well as the executed version which they reviewed. Thus, Mr. Silva knew <u>before</u> August 16, 2005, that Metcap <u>expected</u> a fee and that the fee would be paid by the "parent" company in the merger (which at that <u>time was NASC</u>).

15. On September 22, 2005, a Second Amendment to the Merger Agreement was executed. Mr. Silva was intimately involved in the negotiations with respect to the Second

- 3 -

Amendment (as was Mr. Heil). Section 2.11 of the Second Amendment provided that by November 18, 2005, Fillmore (Mr. Silva's company) would deliver an "Equity Commitment Letter" pursuant to which Fillmore agreed to purchase the "common stock and preferred stock of Parent [NASC] for at least $350 million and to cause Parent ... to make the proceeds of such purchase available as consideration for the [Beverly] Merger." The equity commitment letter, which was annexed as Exhibit C to the Second Amendment, was signed by Mr. Silva.

16. The Second Amendment made no reference at all to Section 5.10 of the Merger Agreement which provided that NASC would pay the Metcap and Wachovia fees. Consequently, as of the execution of the Second Amendment (September 22, 2005) the obligation of NASC to pay the Metcap and Wachovia fees remained intact, with the full knowledge and consent of Mr. Silva. In fact, pursuant to the Second Amendment and the commitment letter, Mr. Silva's company (Fillmore) was going to purchase the stock of NASC (which had agreed to pay Metcap its fee) and the membership interests of SBEV (which had guaranteed to payment obligation of NASC), and Fillmore would thereby become the parent of the entities which had agreed to pay the Metcap and Wachovia fees.

17. In November 2005, Mr. Silva notified all concerned that he had raised the $350 million as provided in Section 2.11 of the Second Amendment. At the same time, Mr. Grunstein suggested that the names of the acquiring entities be changed for reasons unrelated to this lawsuit. Thus, defendants Pearl Senior Care, LLC ("Pearl"), PSC, and Geary Property Holdings LLC ("Geary") were formed on or about November 18, 2005, and substituted as counterparts to NASC, NASC Acquisition and SBEV. Despite the name change, there was not to be any change in the ownership or structure of the deal. Ronald Silva is the President of defendants Pearl and PSC.

18. A Third Amendment to the Merger Agreement ("Third Amendment") was drafted pursuant to which Pearl, PSC Sub and Geary agreed, among other things, to assume all of the rights and obligations of NASC under the Merger Agreement. This included the NASC obligation to pay the MetCap fee and expenses described above. NASC, NASC Acquisition and SBEV were the Assignors pursuant to the Third Amendment, and Pearl, PSC and Geary were the Assignees.

19. On Friday, November 18, 2005, Mark Goldsmith, a principal of NASC and NASC Acquisition, and Leonard Grunstein on behalf of SBEV delivered signature pages to be held in escrow for the purpose of attaching them to the Third Amendment.

20. On Sunday, November 20, 2005, Mr. Grunstein and Mr. Goldsmith reviewed numerous drafts of the Third Amendment, and Mr. Grunstein had numerous telephone conversations with Mr. Silva and Mr. Heil. None of the drafts reviewed by Mr. Grunstein or Mr. Goldsmith through 9 P.M. on November 20, 2005, contained any reference to Section 5.10 of the Merger Agreement, thereby leaving intact the obligation of the defendants (which they were agreeing to assume under the Third Amendment), to pay the Metcap fee. At about 7:00 P.M. on November 20, 2005, the Board of Directors of Beverly approved the Third Amendment based on a draft which contained no reference to Section 5.10 of the Merger Agreement. At no time on November 20th (or prior thereto) did Mr. Silva or anyone at Dechert, discuss with Mr. Grunstein or Mr. Goldsmith any change in Section 5.10.

21. At or about 12:59 a.m. on the morning of November 21, 2005, after Mr. Grunstein and Mr. Goldsmith had gone home and delivered their signature pages, a new version of the Third Amendment appeared, which for the first time contained a new Section 3.9, which provided as follows:

> Section 5.10 of the Merger Agreement is amended by deleting the parenthetical contained therein.

The parenthetical purportedly deleted, was the portion of Section 5.10 pursuant to which NASC had agreed to pay the Metcap fee – an obligation which defendants Pearl, PSC and Geary had previously agreed to assume.

22. The new version of Section 3.9 deleting the parenthetical was done without the knowledge or consent of any of the plaintiffs (including Metcap) and without any discussion with any of them. In fact, the 12:59 a.m. version of the Third Amendment was never even sent to Mr. Goldsmith, the President of NASC. What happened was that defendants caused the new version of Section 3.9 to be drafted; and signature pages were removed from a prior version of the Third Amendment and attached to the new unauthorized version. Defendants remained knowingly silent regarding the change, both before and after it was made.

23. While defendants claim that the change was made by Brink Dickerson (one of Mr. Grunstein's partners at Troutman Sanders) at the request of Joseph Heil, a partner at Dechert, Mr. Dickerson was not representing NASC or Metcap. Troutman Sanders was "deal counsel," and, indeed, Troutman Sanders was paid by Mr. Silva's company for the work it did that night. Mr. Dickerson had no authority to bind NASC, NASC Acquisition, SBEV or Metcap (whom not even defendants claim he was representing).

24. Mr. Silva signed the Third Amendment on behalf of Pearl and PSC. Since Mr. Silva and Mr. Heil were negotiating on behalf of Pearl, PSC and Geary, their conduct in inserting a new Section 3.9 is attributable to each entity. Defendants' conduct in inserting the new Section 3.9, and their knowing silence both before and thereafter was done for the specific purpose of depriving Metcap of its fee, which they knew NASC was unable to pay once it was no longer a party to the Merger Agreement.

25. Plaintiffs did not learn of the new version of the Third Amendment (which deleted the parenthetical in paragraph 5.10) until shortly before litigation was commenced in March 2006. In the interim, Metcap continued to do work in connection with the merger and to advance substantial sums of money with respect thereto. The assignors under the Merger Agreement also relied on defendants' silence regarding the change, in that they allowed the merger to proceed. In December 2006, Mr. Silva's company reimbursed Metcap more than $1 million for the sums that Metcap had advanced in connection with the merger.

26. On March 14, 2006, Beverly completed its merger with PSC.

27. MetCap has not been paid any part of its fee.

### COUNT ONE
### (Fraud)
### By Metcap Against All Defendants (except Beverly)

28. Plaintiffs reallege and incorporate the allegations of the preceding paragraphs herein.

29. Defendants' conduct in inserting the aforesaid Section 3.9 without the knowledge or consent of plaintiffs (or Wachovia) and its knowing silence thereafter, had the purpose and effect of defrauding Metcap by depriving it of the fees that it had already earned.

30. Defendants had a duty to disclose to Metcap the change with respect to Section 3.9. Their silence with respect to the matter was <u>inter alia</u> for the purpose of inducing Metcap to continue to rely on Section 5.10 of the Merger Agreement (and the assumption by the assignee defendants of all of the obligations of NASC, including the obligation to pay Metcap), and thereby induce Metcap to continue to work on the merger. Metcap relied on defendants' silence in that it continued to work on the merger and to advance money in connection therewith.

31. By reason of defendants' fraud, plaintiff Metcap has been damaged in at least the sum of $20 million plus expenses.

## COUNT TWO
### (Unjust Enrichment)
### By Metcap Against All Defendants

32. Plaintiffs reallege and incorporate the allegations of the preceding paragraphs herein.

33. Defendants were unjustly enriched at Metcap's expense in that MetCap acted as the business and financial advisor with respect to, and was the procuring cause of, the merger with Beverly and the transactions related thereto under the Merger Agreement.

34. Equity and good conscience militate against permitting defendants to retain the value of what plaintiff is seeking to recover for at least the following reasons:

   a. Metcap conferred the benefit of its services directly upon defendants.

   b. Defendants were aware even prior to August 16, 2005, of the work that Metcap had done and the fact that it expected and was entitled to a fee.

   c. Defendants were aware at all times that Metcap expected to be paid from the funds raised to consummate the merger transaction, and based on an email dated October 18, 2005, Mr. Silva knew that Metcap's fees were included in the budget for the financing of the merger.

   d. Defendants knew that Metcap continued to do work in connection with the merger even after November 20, 2005, and Mr. Silva expressly authorized the payment of Metcap's expenses after that date.

   e. Defendants knew that following the Third Amendment NASC would be unable to pay Metcap its fee, since NASC was no longer a party to the Merger Agreement and had no independent assets.

   f. Absent a recovery by Metcap against defendants, the assignee defendants will have received the benefit of the assignment from NASC pursuant to the Third Amendment

without assuming one of NASC's material obligations.

   g. Absent a recovery by Metcap against defendants, Metcap will not receive a fee for its substantial contribution and work in connection with the merger, and defendants will have received the benefits of Metcap's services without paying.

  35. By reason of the foregoing, plaintiff Metcap has been damaged in at least the sum of $20 million plus expenses.

COUNT THREE
(Third Party Beneficiary)
<u>By Metcap Against Pearl</u>

  36. Metcap realleges and incorporates the allegations of the preceding paragraphs herein.

  37. Metcap assented to and relied on Section 5.10 of the Merger Agreement in that it continued to perform services and advance money in connection with the merger even after August 16, 2005. Accordingly, the parties to the Merger Agreement had no right to vary or eliminate Metcap's rights under the Merger Agreement without Metcap's consent.

  38. Metcap never consented to Section 3.9 of the Third Amendment which purported to delete the parentheticals in Section 5.10. Accordingly, as the assignee of NASC's obligations under the Merger Agreement, Pearl became obligated to pay Metcap's fee.

  39. Pearl has refused to pay Metcap its fee.

  40. By reason of the foregoing, Metcap has been damaged in the sum of at least $20 million.

COUNT FOUR
(Reformation and Damages)
By All Plaintiffs Against
All Defendants Except Beverly

41.  Plaintiffs reallege and incorporate the allegations of the preceding paragraphs herein.

42.  Prior to 12:59 a.m. on November 21, 2005, the parties to the Third Amendment to the Merger Agreement had reached an agreement and understanding whereby it was agreed that Pearl would assume all of Metcap's obligations under the Merger Agreement, including the obligation in Section 5.10 to pay the Metcap fee. This agreement and understanding is evidenced by inter alia Section 1.1 and 1.2 of the draft of the Third Amendment circulated at 9:04 p.m. on November 20, 2005, which provided that the assignors (including NASC) agree to assign and the assignee defendants agreed to assume "all" of the assignors' rights and obligations under the Merger Agreement (which included the obligation to pay the Metcap fee).

43.  By reason of the assignors' mistake on the one hand, and the knowing silence, concealment, fraud and inequitable conduct by defendants on the other, the final version of the Third Amendment failed to express the agreement of the parties, in that defendants caused the insertion of a new Section 3.9, which purported to eliminate the obligation of Pearl to pay Metcap.

44.  Furthermore, the assignors under the Third Amendment, were justified in relying on the fact that there would be no changes regarding Section 5.10 without further discussion between the principals. This reliance was justified not only based on the dealings and course of conduct interaction between the parties since before August, 2005, but also in view of four specific facts which occurred on November 20, 2006, just hours before the 12:59 a.m. version of the Third Amendment.

      a.    Mr. Grunstein discussed many items with Messrs. Silva and Heil regarding the Third Amendment that day. Not once did either Mr. Silva or Mr. Heil mention a possible change in Section 5.10.

      b.    Mr. Grunstein received numerous drafts of the Third Amendment on November 20th. None of them contained any reference to Section 5.10 of the Merger Agreement.

      c.    The final draft that was sent to Mr. Goldsmith and Mr. Grunstein that evening (at 9:04 P.M.) said nothing about Section 5.10. That draft was accompanied by a covering email which listed three issues which had not yet been addressed. None of these issues related to Section 5.10. Mr. Silva was copied on that email. Under the circumstances it was reasonable for the assignors to assume that if Mr. Silva wanted to make any additional changes on issues other than the three referred to in the email, he would contact the principals directly.

      d.    On November 20, 2005, Mark Goldsmith (who signed the Merger Agreement and the Third Amendment on behalf of NASC and NASC Acquisition) left his office at about 10:00 p.m., at which time he circulated an email leaving telephone numbers where he would be reached if anyone needed him. Although he received several emails and at least one telephone call after he left, he was not sent or copied on the email circulated at 12:59 a.m.; nor was he consulted with respect to that issue.

45.    NASC is adversely affected by the mistake, since in the absence of reformation it will remain liable for Metcap's entire fee pursuant to the agreement between Metcap and NASC. Metcap is also adversely affected by the mistake in the absence of reformation, since NASC is unable to pay its fee.

46.    By reason of the foregoing, plaintiffs are entitled to reformation of the Third Amendment so as to eliminate Section 3.9.

47. By reason of the foregoing Metcap, as an intended third party beneficiary is also entitled to damages in at least the sum of $20 million, for breach of the Merger Agreement and the Third Amendment as reformed.

WHEREFORE, plaintiffs respectfully request that the Court enter judgment as follows:

(a) With respect to Count One, damages in the sum of at least $20 million.

(b) With respect to Count Two, damages in the sum of at least $20 million.

(c) With respect to Count Three, damages in the sum of at least $20 million.

(d) With respect to Count Four, reformation of the Third Amendment, so as to delete Section 3.9 thereof, and damages in the sum of at least $20 million, together with the costs and disbursements of this action, including reasonable attorneys' fees.

BOUCHARD MARGULES & FRIEDLANDER, P.A.

_____
Joel E. Friedlander (#3163)
James G. McMillan, III (#3979)
222 Delaware Avenue, Suite 1400
Wilmington, DE 19801
(302) 573-3500
Attorneys for Plaintiffs

OF COUNSEL:

Martin Stein, Esquire
HELLER, HOROWITZ & FEIT, P.C.
292 Madison Avenue
New York, New York 10017
(212) 685-7600

DATED: August 24, 2006